IN THE COURT OF APPEALS OF TENNESSEE
AT JACKSON
July 16, 2013 Session

JERALD FARMER, INDIVIDUALLY AND AS SURVIVING SPOUSE FOR THE
WRONGFUL DEATH BENEFICIARIES OF MARIE A. FARMER
v.
SOUTH PARKWAY ASSOCIATES, L.P., D/B/A PARKWAY HEALTH
AND REHABILITATION CENTER

Appeal from the Circuit Court of Shelby County
No. CT-000593-11    Gina C. Higgins, Judge

No. W2012-02322-COA-R3-CV - Filed September 25, 2013

This appeal concerns the denial of a motion to compel arbitration. The sister of the decedent signed several admissions documents on the decedent's behalf for purposes of admitting her to the defendant health care facility. At that time, the sister also signed an optional arbitration agreement. Several days later, the decedent passed away, and subsequently, the decedent's beneficiaries brought a wrongful death action against the healthcare facility on her behalf. The healthcare facility moved to compel arbitration, arguing that the sister had authority to bind the decedent to the terms of the arbitration agreement based on several agency theories, as no power of attorney existed. After reviewing the depositions submitted in lieu of live testimony, the trial court determined the arbitration agreement was not enforceable because the sister lacked the legal authority to bind the decedent. Based on a careful review of the evidence, we affirm.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Circuit Court is Affirmed
and Remanded**

ALAN E. HIGHERS, P.J., W.S., delivered the opinion of the Court, in which J. STEVEN STAFFORD, J., concurred, and HOLLY M. KIRBY, J., did not participate.

Stephen D. Crawley and Anna V. Blair, Memphis, Tennessee for Defendant/Appellant South Parkway Associates, L.P.

W. Bryan Smith and Peter B. Gee, Jr., Memphis, Tennessee for Plaintiff/Appellee Jerald Farmer, Individually and on behalf of Marie Farmer and Beneficiaries

# OPINION

## FACTS AND PROCEEDINGS BELOW

This appeal concerns the enforceability of an arbitration agreement. In 2009, Marie Farmer ("Farmer"), who had a history of severe health problems including Type 1 diabetes, was diagnosed with end-stage renal disease at the age of 36. Prior to this diagnosis, Farmer married Plaintiff/Appellee Jerald Farmer ("Husband") and had two children, but the two were separated at the time of Farmer's diagnosis. Since 2005, Farmer and her children had lived with her sister, Angelica Massey ("Massey").

After her diagnosis of renal disease, Farmer was in and out of various hospitals and spent no more than a week at a time at Massey's home, though Massey visited Farmer often and would accompany Farmer when she was admitted to these hospitals.

On October 1, 2009, after a bout with nausea and vomiting associated with complications from her diabetes and renal disease, one of the many hospitals treating Farmer discharged her to Defendant/Appellant Parkway Health and Rehabilitation Center ("Parkway"). Several days later on October 10, 2009, Massey signed several admissions documents on Farmer's behalf. Massey also signed an optional arbitration agreement, which does not make any reference to Farmer. It is undisputed that Farmer never executed a power-of attorney appointing Massey as her representative, nor was Farmer's competency at issue at any point.

Farmer died shortly thereafter on October 19, 2009 due to complications associated with hypoglycemia.

In February 2011, Husband, on behalf of himself and Farmer's beneficiaries, brought a wrongful death action against Parkway, alleging negligence in the treatment of Farmer. In response, Parkway filed a motion to compel arbitration and stay the proceedings, in reliance upon the arbitration agreement executed by Massey. Limited discovery ensued for issues related only to the arbitrability of this action.

In May 2012, the trial court held an evidentiary hearing on Parkway's motion to compel arbitration. However, it appears the trial court only considered the arguments of counsel and the depositions of Massey and Rose Kuykindall ("Kuykindall"), Parkway's admission coordinator; the trial court heard no live testimony.

Generally speaking, Massey testified in her deposition that she routinely handled the paperwork associated with Farmer's admittance into the many hospitals that treated Farmer

in 2009, stating that "nine times out of ten" she would sign the paperwork. She explained however, that Farmer was never present when Massey signed these documents for a variety of reasons, primarily because she would already be receiving treatment in another room, while Massey signed papers at the front desk. Massey confirmed that Farmer never asked her anything about the documents she signed for Farmer and the two never had any discussions about Massey making decisions on Farmer's behalf, healthcare or otherwise. Despite the absence of these discussions, Massey acknowledged that she would make treatment decisions on Farmer's behalf and doctors would often consult her before treating Farmer.

Regarding Farmer's stay at Parkway, Massey explained that a social worker at one of the treating hospitals recommended Parkway for Farmer's rehabilitation. Upon her discharge from the hospital, on approximately October 1st, Farmer was transported via ambulance to Parkway. Massey accompanied Farmer but did not speak with anyone at Parkway upon Farmer's arrival, as she only visited with Farmer for approximately 30 minutes. Massey testified to visiting Farmer at Parkway several times in the next couple of days, but October 10th was the first time Massey remembered talking to anyone at Parkway regarding Farmer's stay.

On October 10th, Massey recalled meeting Rose Kuykindall for the first time in Kuykindall's office. At that time, she proceeded to sign the documents at issue in this appeal. Massey recalled that this meeting took place in the evening and estimated that it lasted no more than 35-40 minutes. Massey repeatedly emphasized that it was only she and Kuykindall at this meeting, and Farmer was not present at any point, stating that, "My sister never attended any meetings like that with me, never."

Massey confirmed reading the admissions documents and acknowledged that Kuykindall explained to her what she was signing in terms of financial responsibilities above and beyond what insurance paid for Farmer. However, Massey did not recall Kuykindall explaining the effect of the arbitration agreement, but she testified that it was likely that Kuykindall did explain the document and she just did not recall it. After the meeting with Kuykindall, Massey stated that she took copies of the signed documents home with her and at no point that evening visited with Farmer. Massey also testified that she never showed the arbitration agreement to Farmer or discussed it with her, as she "never discussed nor showed [Farmer] anything concerning her health, her bills, or anything . . . because she was already going through [the health issues] . . . [and] depression, and so . . . anything that was concerning anything like this I never discussed with her; probably should have, but I didn't." Though Massey acknowledges telling Kuykindall that she was the person to see about Farmer's paperwork and suspected that Farmer knew Massey was signing these documents for her, Massey never had a conversation with Farmer at any point about the admission

documents.

Kuykindall's recollection of her interactions with Massey, on the other hand, differed greatly regarding Massey's execution of the arbitration agreement in question.

In her deposition, Kuykindall recounted meeting Massey for the first time the day Farmer was admitted into Parkway, as she claimed to have given Massey a tour of the facilities; Massey denied meeting Kuykindall at this time and that a tour ever took place. Kuykindall did not meet Farmer at this time.

Kuykindall also recalled meeting Massey and Farmer in her office on the morning of October 10th to complete the admissions paperwork. Kuykindall claims at that time Massey brought Farmer to her office in a wheelchair, at which point Kuykindall proceeded to give a "quick overview" to both Massey and Farmer explaining the admissions paperwork, but did not "name each form . . . just gave her an overview." Kuykindall explained that Farmer "was able to express herself" and "appeared to understand what [they] were discussing," but at no point while Farmer was present did Kuykindall discuss the arbitration agreement.

Kuykindall went on to explain that five minutes into the meeting, Massey asked to meet privately with Farmer and the two left the office for approximately ten minutes. While Kuykindall was unaware of what was privately discussed, she explained that Massey returned to the office alone, at which time Kuykindall asked whether Farmer would be returning, to which Massey replied she would not. Kuykindall then proceeded to explain the specific documents in question to Massey, including the arbitration agreement, which Massey then signed and received copies.

Massey and Kuykindall were the only parties that signed the arbitration agreement; Farmer's name appears nowhere on the document.

Kuykindall testified that she believed Farmer had authorized Massey to act for her during the meeting "in a general sense" because Farmer knew admissions paperwork was going to be signed and nonetheless left the room. However, Kuykindall was unable to confirm that Farmer knew about the arbitration agreement specifically, as Kuykindall acknowledged never having any discussion about an arbitration agreement with Farmer, nor did she provide Farmer a copy of the arbitration agreement or have her sign it. Kuykindall confirmed that she knew, prior to Massey signing the arbitration agreement, that Farmer had never executed a power of attorney, yet thought Massey was authorized to sign the arbitration agreement because Farmer was aware that Massey was completing paperwork on her behalf and never voiced any objections. Kuykindall also explained the optional nature of the arbitration agreement in question, stating that "quite often" people choose not to sign the

-4-

document and still get admitted to Parkway.

At the conclusion of the evidentiary hearing, the trial court orally ruled that Parkway failed to carry its burden of demonstrating the existence of a validly executed and enforceable arbitration agreement, stating that "this fact pattern is sort of fraught with issues and questions."[1]

In September 2012, the trial court entered an order denying Parkway's motion to compel arbitration. In its Order, the trial court made the following findings:

1. [Farmer] was not a party to the Resident and Healthcare Center Arbitration Agreement, which was signed by [Massey] and [Kuykindall];

2. [Massey] did not have the legal authority to bind [Farmer] to the terms of the Resident and Healthcare Center Arbitration Agreement;

3. [Kuykindall's] version of the meeting between herself and [Massey] to review and sign the admissions paperwork is not credible;

4. [Farmer] was not present at the meeting between [Massey] and [Kuykindall] to complete that admission's paperwork at Parkway; and

5. There was never any discussion with Marie Farmer about the admissions process or the admissions paperwork at Parkway, including the arbitration agreement.

The trial court also incorporated by reference a transcript of the oral ruling on the matter. Parkway now appeals.

### ISSUES ON APPEAL AND STANDARD OF REVIEW

Parkway provides a detailed statement of issues presented for review; however, generally speaking, Parkway argues that the trial court erred in finding that Massey lacked both implied actual authority and apparent authority to execute the arbitration agreement. Parkway also argues that the trial court erred in holding that the terms of the arbitration agreement did not apply to Farmer.

---

[1]The trial court reserved the issue of whether the terms of the arbitration agreement were sufficient to bind Farmer at the time it issued its oral ruling and later addressed it in its written order.

This court reviews the denial of a motion to compel arbitration under the same standards applicable to bench trials. ***Cabany v. Mayfield Rehab. & Special Care Ctr.***, No. M2006-00594-COA-R3-CV, 2007 WL 3445550, at *3 (Tenn. Ct. App. Jan. 9, 2007); ***Spann v. Am. Express Travel Related Servs. Co., Inc.***, 224 S.W.3d 698, 706 (Tenn. Ct. App. 2006). Therefore, the trial court's findings of fact are reviewed "*de novo* upon the record of the trial court, accompanied by a presumption of the correctness of the finding, unless the preponderance of the evidence is otherwise." Tenn. R. App. P. 13(d). Generally speaking, when findings of fact are based on the credibility of witnesses, appellate courts must give considerable deference to the trial court's findings based on live testimony, as it had the opportunity to see and hear the witnesses. ***Padilla v. Twin City Fire Ins. Co.***, 324 S.W.3d 507, 511 (Tenn. 2010) (citing ***Anderson v. Westfield Grp.***, 259 S.W.3d 690, 695 (Tenn. 2008)). However, the trial court in this case did not rely on live witnesses but rather made findings of fact based on documentary evidence only. ***Padilla***, 324 S.W.3d at 511 (citing ***Glisson v. Mohon Int'l, Inc./Campbell Ray***, 185 S.W.3d 348, 353 (Tenn.2006); ***Saylor v. Lakeway Trucking, Inc.***, 181 S.W.3d 314, 322 (Tenn. 2005). In such a case, appellate courts need not give similar deference to such findings, but instead an "appellate court may make an independent assessment of credibility of documentary proof it reviews, without affording deference to the trial court's findings." ***Mid-Century Ins. Co v. Williams***, 174 S.W.3d 230, 236-37 (Tenn. Ct. App. 2005). Additionally, the trial court's conclusions of law are also reviewed *de novo* with no presumption of correctness given. ***Bowden v. Ward***, 27 S.W.3d 913, 916 (Tenn. 2000).

## ANALYSIS

"The right of access to the courts and to receive a trial by jury is an individual right and cannot be waived by a third party without proper authorization from the individual. Parties simply cannot be required to arbitrate claims they did not agree to arbitrate." ***Blackmon v. LP Pigeon Forge, LLC***, No. E2010-01359-COA-R3-CV, 2011 WL 9031313, at *14 (Tenn. Ct. App. Aug. 25, 2011). On appeal, Parkway argues that Massey was properly authorized to execute the arbitration agreement in question on Farmer's behalf based on common-law agency theories.

Generally speaking, Tennessee common law recognizes two types of authority in which the legal consequences of an agent's actions can be attributed to the principal and an agency relationship is created: actual and apparent authority. ***Barbee v. Kindred Healthcare Operating, Inc.***, No. W2007-00517-COA-R3-CV, 2008 WL 4615858, at *6 (Tenn. Ct. App. Oct. 20, 2008) (citing Restatement (Third) of Agency ch. 2, Introductory Note (2006); ***Miliken Group, Inc. v. Hays Nissan, Inc.***, 86 S.W.3d 564, 567 (Tenn. Ct. App. 2001)). Actual authority may take the form of express authority or may be implied if "given implicitly by the principal to his agent . . . or inferred from a course of dealing between the

alleged principal and the agent." ***Bells Banking Co. v. Jackson Ctr., Inc.***, 938 S.W.2d 421, 424 (Tenn. Ct. App. 1996). Apparent authority on the other hand is the power held by the putative agent "to affect a principal's legal relations with third parties when a third party reasonably believes the [putative agent] has authority to act on behalf of the principal and that belief is traceable to the principal's manifestations." ***Barbee***, 2008 WL 4615858, at *6 (citing Restatement (Third) of Agency § 2.03).

Unlike most cases involving arbitration agreements signed upon the admission to a nursing home or health care facility, in which an agent's authority is based on a power-of-attorney or oral statements made by the principal, in this case no express grant of actual authority is present. ***Barbee,*** 2008 WL 4615858, at *8 (listing cases involving express grants of authority). Because the parties concede that no express actual authority to execute the document exists, we turn to the remaining agency theories to determine whether Massey had either implied actual authority or apparent authority to execute the arbitration agreement. We find an overview of these remaining agency theories to be helpful.

Agency must be proven by the party seeking to assert it and the "scope and extent of an agent's real and apparent authority" must "be determined . . . from all the facts and circumstances in evidence." ***John J. Heirigs Const. Co., Inc. v. Exide***, 709 S.W.2d 604, 608 (Tenn. Ct. App. 1986); ***Sloan v. Hall***, 673 S.W.2d 548, 551 (Tenn Ct. App. 1984). An agency relationship is created only "at the will and by the act of the principal and its existence is a fact to be proved by tracing it to some act of the alleged principal and turns on facts concerning the understanding between the alleged principal and agent." 3 Am.Jur.2d Agency § 15; ***see also Thornton v. Allenbrooke Nursing & Rehab. Ctr., LLC***, No. W2007-00950-COA-R3-CV, 2008 WL 2687697, at *5 (Tenn. Ct. App. July 3, 2008). "For an agency relationship to arise, the 'principal must intend the agent to act for him or her, the agent must intend to accept the authority and act on it, and the intention of the parties must find expression either in words or conduct between them.' " ***Thornton***, 2008 WL 2687697, at *5 (citing 3 Am.Jur.2d Agency § 15 (2007)).

"The term 'implied authority' is typically used to denote actual authority either to do what is necessary to accomplish the agent's express responsibilities, or to act in a manner that the agent reasonably believes the principal wishes the agent to act, in light of the principal's objectives and manifestations." ***Barbee,*** 2008 WL 4615858, at *6 (citing Restatement (Third) of Agency § 2.01 cmt. b.). It has also been described as "authority given implicitly by the principal to his agent; . . . it is actual authority circumstantially proved, or evidenced by conduct, or inferred from a course of dealing between the alleged principal and the agent." ***Bells Banking Co. v. Jackson Ctr., Inc.***, 938 S.W.2d 421, 424 (Tenn. Ct. App. 1996). The Restatement explains implied authority as the authority "to do what is necessary, usual, and proper to accomplish or perform an agent's express responsibilities or . . . to act in a manner

in which an agent believes the principal wishes that agent to act based on the agent's reasonable interpretation of the principal's manifestation in light of the principal's objectives and other facts known to the agent." Restatement (Third) of Agency § 2.01 cmt. b. "[Implied authority] differs from apparent authority in that it is authority which the principal intended that the agent should have. . . . Implied powers . . . must be bottomed on some act or acquiescence of the principal, express or implied . . . their existence or nonexistence in any particular instance being always determinable by reference to the intention of the parties." *Bells Banking Co.,* 938 S.W.2d at 424.

Conversely, apparent authority has been described by Tennessee courts as follows:

(1) such authority as the principal knowingly permits the agent to assume or which he holds the agent out as possessing;

(2) such authority as he appears to have by reason of the actual authority which he has;

(3) such authority as a reasonably prudent man, using diligence and discretion, in view of the principal's conduct, would naturally suppose the agent to possess.

*See Barbee*, 2008 WL 4615858, at *6 (citing *Franklin Distrib. Co. v. Crush Intern. (U.S.A.), Inc.*, 726 S.W.2d 926, 930-31 (Tenn. Ct. App. 1986)). In *Barbee v. Kindred Healthcare Operating, Inc.*, this Court went on to note that "a principal is responsible for the acts of an agent within his apparent authority only where the principal himself by his acts or conduct has clothed the agent with the appearance of authority, and not where the agent's own conduct has created the apparent authority." *Barbee ,* 2008 WL 4615858, at *9 (citing *S. Ry. Co.*, 197 S.W. at 677).

On appeal, Parkway argues that Massey had both implied authority and apparent authority to sign the Arbitration Agreement on behalf of Farmer. We will address each argument presented by Parkway in turn.

Parkway argues that Massey had the implied authority to sign the arbitration agreement on Farmer's behalf based on the "course of dealings with regard to Mrs. Farmer's healthcare matters, and . . . the fact that Ms. Massey, in signing the Parkway admission papers, acted in accordance with Mrs. Farmer's pattern of acquiescence." Parkway argues that by Farmer repeatedly permitting Massey to sign her healthcare documents, she demonstrated her intent for her sister to act on her behalf in all matters relating to healthcare and that this "pattern of acquiescence" by Farmer gave Massey implied actual authority to

-8-

sign the arbitration agreement at issue.[2]

At the outset, we note we have found no Tennessee court that has applied the implied actual authority principle in the context of agreements to arbitrate in the nursing home setting and the parties have not directed us to one.[3]  In fact, in the recent case, ***Blackmon v. LP Pigeon Forge, LLC***, this Court notably excluded implied authority as a basis for authority in this context, stating that "[a]n arbitration agreement signed by a family member, even a next of kin, without the express or apparent authority of the nursing home resident, is invalid."  ***Blackmon***,  2011  WL  9031313,  at  *14  (citing  ***Raiteri v. NHC Healthcare/Knoxville, Inc.***, No. E2003-00068-COA-R9-CV, 2003 WL 23094413 (Tenn. Ct. App. Dec. 30, 2003)).

However, even *assuming arguendo* that implied actual authority could actually be a basis in which to establish an agency relationship in this context, Parkway only points to the fact that Massey repeatedly signed health care documents on behalf of her sister and that Farmer's pattern of acquiescence gave Massey the implied authority to act.

After carefully examining the record, we must find the fact that Farmer never challenged Massey's pattern of routinely signing admission documents on her behalf is not controlling as to the arbitration agreement in question because Farmer could not object to an optional arbitration document she knew nothing about.  Farmer may have suspected that Massey would sign the necessary admission documents at Parkway, but the optional arbitration agreement was not a necessary admission document.  Even if we were to credit Kuykindall's version of events, Kuykindall clearly testified that nothing about an arbitration agreement was ever discussed in Farmer's presence, Farmer was not in the room when the arbitration agreement was actually explained or signed, and the record does not reflect that Farmer had any knowledge about an arbitration agreement whatsoever either before or after its execution.  Parkway has not demonstrated that Farmer impliedly gave authority to Massey

___

[2]Parkway relies on several cases for the proposition that the execution of an arbitration agreement is to be considered a health care decision when either express actual authority to sign admission documents is present or when a power of attorney exists. ***See Owens v. Nat'l Health Corp.***, 263 S.W.3d 876, 884-85 (Tenn. 2007); ***Necessary v. Life Care Ctrs. Of Am. Inc***, No. E2006-00453-COA-R3,CV, 2007 WL 3446636, at *5 (Tenn. Ct. App. Nov. 16, 2007).  It is unclear if this same extension could be made to include optional arbitration when an express declaration of authority is absent, but we need not address this issue for purposes of this appeal.

[3] Parkway points out that this Court acknowledged that implied authority "is clearly recognized as a basis for an agency relationship" in other contexts, though it has not been applied to situations involving arbitration agreements executed upon the admission to health care facilities. ***See Estate of Mooring v. Kindred Nursing Ctrs.***, No. W2007-02875-COA-R3-CV, 2009 WL 130184, *6 n. 4 (Tenn. Ct. App. Jan. 20, 2009).

to sign a document that she knew nothing about; especially one that her admission to the facility was not dependent upon and was clearly an optional waiver of Farmer's constitutional rights.

Like the trial court we find this to be clearly insufficient to demonstrate that Farmer would have wanted Massey to waive her right to a jury. Merely because Farmer in the past failed to object to Massey signing required admissions documents and making other necessary healthcare related decisions – though the record indicates Farmer never gave express authority for Massey to even make these admission decisions – this does not authorize Massey to sign an optional arbitration agreement that was not necessary to admission.[4] Other states that have addressed implied authority in this context have reached similar results. ***See Koricic v. Beverly Enterprises-Nebraska, Inc.***, 773 N.W.2d 145, 151 (Neb. 2009) (finding that, while an agent did have actual implied authority to sign nursing home admissions documents, "his actual authority did not extend to signing an arbitration agreement that would waive [the principal's] right of access to the courts and to trial by jury" because the agreement was optional and was not required to remain at the facility); ***Curto v. Illini Manors, Inc.***, 940 N.E.2d 229, 233 (Ill. Ct. App. 2010) (finding that a nursing home failed to prove implied authority because there was no evidence that the putative agent was present, directed by the principal to sign, or even knew about an arbitration agreement).

---

[4] We note that in ***Necessary v. Life Care Centers of America, Inc.***, No. E2006-00453-COA-R3-CV, 2007 WL 3446636 (Tenn. Ct. App. 2007), the Eastern Section of this Court held that a husband's decision to give his wife express oral permission, or actual authority, to sign admitting documents on his behalf also extended to the optional arbitration agreement she chose to sign, although the husband was unaware of it. The Court explained:

> Plaintiff essentially argues that she had express authority from the Decedent, who was competent to give her that authority, to sign all of the admission documents and make all of the decisions regarding his admission to Life Care's facility-except one: she did not have his authority to sign an arbitration agreement, even though he did not withhold such authority. Such a conclusion would result in the type of "untenable" situation described in *Owens*, supra. Therefore, we hold that Plaintiff, who had the Decedent's express authority to sign the admission documents at the healthcare facility, also had the authority to sign the arbitration agreement on the Decedent's behalf as one of those admission documents.

In this case, of course, there was no express grant of authority to sign admission documents. There was simply a failure to object to the signing of required admission documents in the past. We decline to extend the reasoning of ***Necessary*** to the facts of this case, involving implied authority.

-10-

Based on this, assuming this is even a valid extension of the agency theory in this context, we have no choice but to affirm the trial court's finding that Massey lacked that implied actual authority to sign the arbitration agreement on Farmer's behalf.

Having determined that no actual authority existed that would validate the arbitration agreement, we now consider Parkway's argument that Massey had apparent authority to sign the arbitration agreement on Farmer's behalf. *See Thomas v. Pointer*, No. W2011-01595-COA-R3-CV, 2012 WL 2499590, at *7 (Tenn. Ct. App. June 29, 2012) ("Apparent authority becomes an issue only in the absence of actual authority.")(emphasis omitted). Parkway argues, in reliance upon Kuykindall's recount of the arbitration agreement's execution, that Farmer granted Massey apparent authority by leaving the meeting in Kuykindall's office and in allowing Massey alone to return to sign the paperwork. Parkway argues that Farmer's action in not returning to the office "clothed" Massey with the appearance of authority and that Kuykindall reasonably relied on this apparent authority.

Under an apparent authority theory, in order for a principal to be bound by an agent, the third party's belief that the agent has such authority must be traceable to the principal's manifestation and cannot be established by the agent's acts, declarations, or conduct. Restatement (Third) Agency § 2.03 cmt. c.; *Barbee*, 2008 WL 4615858, at *9 ("[A]gency status, via either actual authority or apparent authority, stems from the actions of the *principal*.") (emphasis in original) (citing *S. Ry. Co.*, 197 S.W. at 677)). As mentioned, Kuykindall clearly testified this alleged meeting in her office was the only time that Kuykindall met or even spoke to Farmer. She also unequivocally stated that the arbitration agreement was never discussed during this meeting when Farmer was present. The mere fact that Farmer, assuming she was even in Kuykindall's office in the first place, met with Kuykindall for at most 5 minutes and then left Massey to sign what she knew to be only admission documents, is not sufficient to show that Farmer clothed Massey with the authority to sign an arbitration agreement. In Tennessee, in order to prove apparent authority, courts have required there to be an "overt affirmation of agency." *See Wilson v. Americare Sys., Inc.*, No. M2008-00419-COA-R3-CV, 2009 WL 890870, at *5 (Tenn. Ct. App. Mar. 31, 2009) (citing *Thornton*, 2008 WL 2687697, at *7). Again, there is no evidence that Farmer even knew about an arbitration agreement, thus Farmer's leaving the room cannot be an acquiescence, much less an overt affirmation to a third party that she authorized Massey to sign the arbitration agreement. The *Wilson* case directly addressed this issue:

> Absent an overt affirmation of agency, our courts have held that the authority to contract for medical services cannot be premised upon apparent authority. *Thornton*, 2008 WL 2687697, at *7; *Raiteri*, 2003 WL 23094413, *9. The cases are consistent in "finding no authority if the principal did not exhibit some sort of act to convey the authority." *Thornton*, 2008 WL 2687697, at *7.

There is no evidence in the record before us that [the principal] was present when [the putative agent] signed the Residence and Service Agreement. There is no evidence she exhibited any sort of act to convey the authority to [the putative agent] to sign the agreement in her behalf. It follows that defendants failed to establish [the putative agent] had the authority to sign the Residence and Service Agreements for [the principal]. Thus, we hold the record fails to establish there was a valid arbitration agreement for the trial court to enforce.

*Wilson v. Americare Sys., Inc.*, No. M2008-00419-COA-R3-CV, 2009 WL 890870, at *5 (Tenn. Ct. App. Mar. 31, 2009).[5]

Considering the entirety of the record, including Kuykindall's account of the October 10th meeting, no act or manifestation by Farmer would have been sufficient to induce Kuykindall to believe that Massey had the authority to sign the arbitration agreement. In fact, it is this Court's belief that the alleged impromptu private discussion between Massey and Farmer combined with Kuykindall's knowledge that no power of attorney existed should have raised suspicions about the basis of Massey's claimed authority, if anything.

Given the unique circumstances presented by this case and the lack of any kind of conversation or action whatsoever between Farmer and either Massey or Kuykindall regarding her health decisions, much less the arbitration agreement in question, we must agree with the trial court that this case is "fraught with issues and questions." Thus, we have no choice but to also find that Massey lacked apparent authority to sign the arbitration agreement on Farmer's behalf. Parkway has simply failed to prove that Massey's actions were within the scope of her authority. Therefore, we find Massey lacked authority to execute the arbitration agreement in question, rendering it invalid and unenforceable. This being the case, we need not address Parkway's final argument that the trial court erred in finding that the precise terms of the arbitration agreement did not apply to Farmer, as Massey was not authorized to execute the document in the first place. All other issues raised on appeal are pretermitted by this decision.

---

[5] We note that courts in other jurisdictions have found that apparent authority can be established "by omission as well as commission, and such authority is implied where the principal passively permits the agent to appear to a third person to have authority to act on his behalf." *Perry v. Meredith*, 381 So.2d 649, 650 (Ala. Civ. App. 1980); *see also Broughsville v. OHECC, LLC,* No. 05CA008672, 2005 WL 3483777, at *2 (Ohio Ct. App. Dec. 21, 2005) (finding that a daughter had apparent authority to execute admissions documents including an arbitration agreement for her mentally competent mother only because the mother was present when the documents were executed and "knowingly permitted" her daughter to sign them.) However, Tennessee courts expressly have rejected this position. *See Barbee*, 2008 WL 4615858, at *8.

**CONCLUSION**

The decision of the trial court is affirmed and remanded. Costs on appeal are assessed against Defendant/Appellant South Parkway Associates, L.P., and its surety for which execution may issue, if necessary.

_____

ALAN E. HIGHERS, P.J, W.S.